TIGER BROS. & LEVINE MERCANTILE COMPANY *v.* GRIFFIN.

Opinion delivered October 9, 1922.

1. FRAUDS, STATUTE OF—PART PERFORMANCE.—Where an oral contract for the sale of cotton in a warehouse and other cotton stored elsewhere was an entire contract, the delivery and acceptance of that part of the cotton stored in the warehouse took the contract out of the statute of frauds.

2.    APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING.—
A finding of the chancellor that a sale of two lots of cotton con-
stituted an entire contract *held* not against the preponderance
of the evidence.

3.    SALES—FRAUD—BURDEN OF PROOF.—In a buyer's action for non-
delivery of cotton, in which the seller claimed that the sale was
induced by false and fraudulent representations of buyer as to
the grades of the cotton, which he had examined in a warehouse,
the seller had the burden of proving the alleged false repre-
sentation.

4.    SALES—FALSE REPRESENTATIONS—FINDINGS.—In a buyer's action
for nondelivery of cotton, in which the seller claimed the sale
to have been induced by false representations of the buyer as to
the grade of the cotton, the chancellor's finding that there were
no false representations *held* not against the preponderance of
the evidence.

5.    SALES—FINDING AS TO DATE OF BREACH.—In a buyer's action for
nondelivery of cotton, the chancellor's finding as to the date on
which the breach occurred *held* not against the preponderance of
the evidence.

Appeal from Mississippi Chancery Court, Chick-
asawba District; *Archer Wheatley*, Chancellor; affirmed.

*Cooley & Adams,* for appellants.

1.    The agreement for sale of the cotton at Manila
was induced by such fraudulent representations on the
part of appellee as to entitle appellant to refuse to per-
form. 26 Ark. 28; 71 *Id.* 305, 309; 73 *Id.* 542, 547; 95 *Id.*
131, 136; 104 *Id.* 388, 396; 123 *Id.* 492; Crawford's Di-
gest, vol. 3, title, Fraud.

Levine's statement to plaintiff, where the latter
pointed out the samples to him, that he did not want to
see them because he could not tell anything about them
after looking at them, was an express declaration of his
own lack of knowledge and experience, and of his de-
pendence upon and confiding in the knowledge of the
plaintiff. 38 Ark. 334, 340; 99 *Id.* 438, 442; 20 Cyc. 60.

2.    The agreement was within the statute of frauds,
and not enforceable. C. & M. Digest, § 4864; 20 Cyc.
238; 35 Cyc. 298; 39 Ark. 571; 25 R. C. L. 634, § 258;
35 Cyc. 117; 25 R. C. L. 607, § 215; Williston on Con-

tracts, vol. 1, § 561; 4 A. L. R. 908; 23 R. C. L. 1346-7, § 170; 145 Ark. 475; 36 S. C. 69, 15 S. E. 344; 4 A. L. R. 914.

3. The damages assessed by the court are excessive. The vendee, when entitled to recover, may recover only the difference between the contract price and the market price of cotton of the same grade as that called for in the contract, on the day it is ascertained that the vendee will not perform. 79 Ark. 338, 344; 117 *Id.* 442; 35 Cyc. 633. In this case appellee had positive notice on August 31st that the cotton would not be delivered.

*C. A. Cunningham,* for appellee.

1. As to the question whether or not the sale of the cotton by appellants was one transaction or two, the testimony is in irreconcilable conflict, and the chancellor's finding therefore ought not to be disturbed, unless there is a clear preponderance against it. 79 Ark. 338; 134 *Id.* 284; 48 Atl. 107; 80 Am. St. Rep. 410; 53 Atl. 782; 96 Am. St. Rep. 211, 220.

2. The burden of proof was on the appellants to show fraud. 143 Ark. 580, 590. It is a firmly established principle that if the means of information are alike accessible to both, so that with ordinary prudence or vigilance the parties might respectively rely upon their own judgment, they must be presumed to have done so; or, if they have not so informed themselves, must abide the consequences of their own inattention and carelessness. 11 Ark. 58; 19 *Id.* 522; 47 *Id.* 48; 71 *Id.* 91; 83 *Id.* 403; 87 *Id.* 570; 95 *Id.* 131; *Id.* 154; *Id.* 375; *Id.* 527; 101 *Id.* 608; 112 *Id.* 498; 113 *Id.* 81; 119 *Id.* 100; 129 *Id.* 508; 143 *Id.* 592.

McCULLOCH, C. J. Appellant is a domestic corporation, engaged in the general mercantile business at Manila, a town in Mississippi County, and as an incident to its business it buys cotton from its customers.

On August 25, 1921, appellant owned 104 bales of cotton, situated in its warehouse at Manila, and on that day it entered into an oral contract with appellee for the

sale of said cotton at ten cents per pound, payable at the Blytheville Compress at Blytheville, Arkansas. Appellee was a cotton buyer, with an office at Blytheville. Appellant delivered the cotton to the warehouse at Blytheville and received warehouse receipts, but refused to make delivery to appellee in consummation of the sale, and appellee instituted the present action in the chancery court of Mississippi County, setting forth in its complaint the oral agreement for the sale of the cotton and the breach thereof and alleging that appellant was insolvent. The prayer of the complaint was either for specific performance of the contract or for the recovery of damages for breach of the contract.

In the complaint it was alleged that there was a sale of 154 bales of cotton in all, fifty bales of which were situated at Blytheville, in a warehouse, which were delivered and paid for in part performance of the contract.

Appellee secured in the action a temporary injunction restraining appellant from disposing of the cotton, and also caused an order of specific attachment to be issued and levied on the cotton. Subsequently, appellant gave bond in discharge of the specific attachment, and there was an agreement that the case should proceed to trial in the chancery court. The trial in that court resulted in a decree in favor of appellee and against appellant for the recovery of $3,337.68, the difference found by the court between the contract price of the cotton and the market value thereof on the day on which appellant was shown to have broken the contract.

Appellant, in its answer, pleaded the statute of frauds as a defense, and also alleged, by way of defense, that appellee had falsely and fraudulently misrepresented to appellant's agent the grades of the cotton, and that appellant was induced by such representations to enter into the contract.

It is undisputed that appellant entered into an oral agreement with appellee for the sale and delivery of the 104 bales of cotton which are the subject-matter of the

controversy, and that appellant thereafter refused to consummate the sale, but the first and principal point in the controversy between the parties is whether or not the contract was within the statute of frauds.

At the time the agreement was entered into between the parties, appellant owned fifty bales of cotton, which were stored in a warehouse in Blytheville, and also owned 104 bales of cotton, stored in its own warehouse at Manila—at least the 104 bales were in appellant's possession, some of it being cotton owned by appellant's customers, but appellant had authority to sell it.

A few days before the contract was entered into between the parties, appellee went out to Manila on a visit to appellant's store, and approached the manager, Mr. Ike Levine, on the subject of purchasing the cotton. After appellee was informed that appellant desired to sell the cotton, appellee and one of appellant's clerks went out to the warehouse and sampled the cotton at that place, and these samples were placed in a sack and taken by appellee back to Blytheville.

On the day the contract was made, appellant's manager, Levine, went to Blytheville, and negotiations between the parties took place between Levine and appellee personally in the latter's office. Appellee purchased the fifty bales of cotton at ten cents per pound, and that was delivered and paid for. On the bill, or account of sales, for the fifty bales, which appellee furnished to Levine showing the quantity of cotton and the total price, appellee made an unsigned pencil memorandum in the following words: "Bought 104 or 106 at Manila at 10c f. o. b. Blytheville press, to be delivered at once, or early as possible."

It was understood between the parties, and the testimony clearly shows, that there was some uncertainty as to whether appellant had 104 or 106 bales at Manila, and the agreement was that the sale was to cover the number of bales at Manila, whether 104 or 106. It turned out that there were only 104 bales. The contract was entirely oral, without any writing signed by the parties to

be charged, and was clearly within the statute of frauds unless something else occurred between the parties to take the contract out of the operation of the statute. Crawford & Moses' Digest, sec. 4864.

The contention of appellant is that the contract for the sale of the undelivered cotton then at Manila was separate and distinct from the contract for the sale of the fifty bales in the warehouse at Blytheville, and that since there was no writing, and no delivery of any of that portion of the cotton, the circumstances did not take the case out of the operation of the statute of frauds. On the other hand, the contention of appellee is that there was only one contract, which covered the purchase of 154 bales of cotton, of which fifty bales were in the warehouse at Blytheville, and the other 104 bales were stored at Manila; that there was a delivery of the fifty bales and payment therefor, which took the oral contract out of the operation of the statute.

The law on this subject has been plainly settled in repeated decisions of this court, and the case presents merely a question of fact, whether or not the contract was an entire one for the sale of both lots of cotton, to be delivered in installments, or whether there were separate contracts without any delivery being made under the contract for the sale of the cotton in controversy. If, as contended by appellee, the sale was entire, and there was an actual delivery and acceptance of a part of the cotton sold, the case does not fall within the statute of frauds, and appellee is entitled to recover. *Brockman Com. Co.* v. *Pound,* 77 Ark. 364; *Walnut Ridge Merc. Co.* v. *Cohn,* 79 Ark. 338; *Ark. Short Leaf Lbr. Co.* v. *McInturf,* 134 Ark. 284; *Breckenridge & Brashears* v. *Hearne Timber Co.,* 135 Ark. 31.

There is a conflict in the testimony on the issue as to the entirety of the contract. It is admitted that there were four persons present when the contract was entered into in appellee's office in Blytheville. In addition to appellee Griffin, and Ike Levine, appellant's manager, there were present Julius Levine, a brother of Ike, and

C. H. Bond, another cotton buyer. Appellee and Ike Levine both testified as witnesses, and so did Julius Levine and Bond. Appellee and Bond both testified positively that the sale was entire; that Levine stated that he wanted to sell all of the cotton that appellant had on hand, and that there was a lump trade made for the whole of the 154 or 156 bales at the round sum of ten cents per pound. Each of the other two witnesses, Ike Levine and Julius Levine, testified that there was a separate sale of the two lots of cotton.

Appellee, in his testimony, stated the substance of the negotiations with Levine in the following language: "I was trading with him and he told me what he had been offered for the fifty bales here in the press, and I asked him then what he would take for the whole lot. He said he would sell it all in one lot and wanted to get rid of it. He said, 'I want to sell out and get rid of all the cotton I have,' and after I figured out the average I had never made him an offer. He told me he had been offered nine and a-half cents for the cotton that was here in the press. He then said he would sell it for ten cents around for the whole lot of cotton. I figured for a few minutes and told him I would take it."

Witness Bond stated the transaction (quoting from his cross-examination) as follows:

"Q. It was all bought in one lot? A. Yes sir. Q. And all located in the same place? A. No, fifty bales here in the compress, and 104 or 106 at Manila. Q. How could it be one lot when the fifty bales were located here and paid for, while the other 104 or 106 bales were at Manila and not paid for? A. Because it was discussed as one lot, offered as one lot, sold as one lot and bought as one lot. Mr. Griffin figured on it as one lot. The fifty bales were paid for that day because it was here in the press and the receipts could be turned over. The other could not be paid for until it was placed in the press and the receipts turned over. Q. Yet he bought and paid for it separately? A. He did not. You pay for

cotton as it is delivered. He was to pay for this Manila cotton when it was delivered to the press and the recepits turned over to him.''

Appellee and Bond both testified that the samples of all the cotton were then on the table in the presence of the parties in appellee's office, and that appellee said to Levine, ''There are your samples,'' and that Levine answered saying that he did not care anything about looking at the samples. The two Levines testified on this point that only the samples of the Manila cotton were on the table at the time.

There is the testimony of two witnesses on each side of this controversy, one of which on each side is directly interested in the result. Julius Levine is a brother of one of the interested parties, and Bond appears to be wholly unconnected with the controversy and without interest in it.

We cannot say that the testimony preponderates against the finding of the chancellor, and under those circumstances it becomes our duty not to disturb the chancellor's finding.

Treating it as settled that there was an oral contract for the sale of the cotton, that part which was immediately delivered as well as the remaining part of the cotton, which is the subject of the controversy, the delivery of a part took the case out of the operation of the statute.

There is also a conflict in the testimony as to the charge made by appellant that the sale was induced by false and fraudulent misrepresentation of appellee as to the grades of the cotton. Ike Levine testified that he did not examine the samples of cotton to ascertain the grades, but that after appellee had examined the samples he asked appellee about the grades, and that appellee stated to him that there were about thirty bales of white cotton, which is the highest grade, and twenty-five bales of gray cotton, and forty-nine bales of blue cotton, which is the lowest grade, and the witness stated that he subsequently ascertained that there was practically no

blue cotton in the list at all. He said that appellee, in response to his inquiry, placed the value of the blue cotton at seven cents a pound, the gray cotton at nine cents, and the white cotton at twelve and a-half or twelve and three-quarters cents.

Appellee denied that he made any misrepresentation concerning the grade of the cotton, and stated that all that was said between the parties; when they made the trade, was that Levine said that some of the cotton belonged to his customers, and asked for a statement of the value of the different grades, so that he would know how to settle with his customers, and that he (witness) told Levine that the basis of settlement, according to the average price of ten cents per pound, would be seven cents per pound for blue cotton, nine cents for gray, and twelve and a half or twelve and three-quarters for white.

There is some corroboration of appellee in the testimony of one of appellant's clerks to the effect that when Levine announced that he would not deliver the cotton he stated as the only reason that the sampling of the cotton was wrong, and said nothing about misrepresentation as to the grades.

The burden was on appellant to prove the alleged false representation, and we are of the opinion that the finding of the chancellor on this issue is not against the preponderance of the testimony.

There remains to dispose of the last of appellant's contentions, which is that the finding as to the amount of damages is excessive. This question turns on the proof as to when the breach occurred, for there is no dispute as to the market value of the cotton on the different dates mentioned in the testimony. The real controversy arises as to when the breach of the contract occurred.

The agreement was that the cotton should be delivered as soon as convenient by hauling it in wagons from Manila to Blytheville. Appellee contends that the breach did not occur until September 2, and that the cotton was worth sixteen and a-half cents on that date. The court

estimated the damages on the basis of sixteen cents per pound on that date, and awarded appellee six cents per pound as damages.

Appellee testified that on August 30 he had a telephone conversation with Levine, in which the latter stated that he was sick, but would go to Blytheville in a few days and deliver the cotton, but that he failed to come to Blytheville, and that he (appellee) went out to Manila on September 2, and that Levine then, for the first time, refused to deliver the cotton.

Levine testified that in a telephone conversation on August 31 he distinctly and unequivocally refused to deliver the cotton, and appellant's contention is that if there was a wrongful breach of the contract, it occurred on that day, when, according to the undisputed testimony, 14.87 was the market price of the cotton. It appears that the price of cotton began rising on the very day this contract was entered into, and that it continued to rise day by day. We think that the chancellor's finding upon this issue, as well as upon the other issues in the case, was not against the preponderance of the testimony.

The decree must therefore be affirmed, and it is so ordered.